**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

DAVID WELSH,
                      Plaintiff,

-vs-                                                  Case No.  2:10-cv-582-FtM-SPC

NEWMAN INTERNATIONAL TRANSPORT,
INC.,
                      Defendant.
_____

## ORDER

This matter comes before the Court on Defendant's Motion to Exclude Plaintiff's Expert Witness (Doc. #34) filed on July 1, 2011.  Plaintiff David Welsh filed a Response (Doc. #47) on August 15, 2011.  This motion is now ripe for review.

## FACTS

This case concerns a dispute over reimbursement for damage to private property – namely two vehicles – sustained while being transported in interstate commerce.  In January 2010, Plaintiff David Welsh hired Defendant Newman International Transport to transport two classically restored vehicles, a 1969 Ford Mustang and a 1970 Dodge Challenger, to automobile auctions in Arizona from Alva, Florida.  (Pl. Am. Compl. ¶¶ 7, 12).  Defendant issued Plaintiff Bills of Lading for the transport of the vehicles.  (Pl. Am. Compl. ¶¶ 8, 13).  The two vehicles were damaged in transit, Pl. Am. Compl. ¶ 24, and were shipped back to Florida for repair by Plaintiff.  (Pl. Am. Compl. ¶ 26).

On February 2, 2010, Plaintiff sent Defendant correspondence notifying it of a claim. (Doc. # 43-3, Pl. Ex. C).  In the letter, Defendant requested "prompt payment for repairs as well

1

as [reimbursement] for money spent to be at auctions." (Doc. # 43-3, Pl. Ex. C). The letter spelled out requests and justifications for $6,113.00, and indicated that Plaintiff expected the cars to sell for "75-100,000 [dollars] each" at auction. (Doc. # 43-3, Pl. Ex. C). During a phone conversation on February 26, 2010, Plaintiff and Defendant's insurer negotiated a settlement amount of $14,191.00, and a check was issued to Plaintiff for that amount, with "settlement for 69 Mustang & 1970 Challenger" printed on the back. (Doc. # 43-6, Pl. Ex. F). The Plaintiff subsequently deposited the check, after endorsing it and adding the word "repairs," to read "settlement for 69 Mustang & 1970 Challenger *repairs*" under his signature. (Doc. # 43-6, Pl. Ex. F) (emphasis added).

On March 1, 2010, Plaintiff sent Defendant a letter which indicates that Plaintiff did not consider his claim settled and which threatened legal action. (Doc. # 43-4, Pl. Ex. D). On March 2, Defendant's insurer sent a proposed Release which would have released all claims against the Defendant, whether for repairs or diminution in value damages. Plaintiff did not sign this Release. (Doc. # 43-5, Pl. Ex. E).

The cars were both eventually sold at auction in Palm Beach, Florida, on April 3, 2010. (Doc. # 43-1, Pl. Ex. A). At auction, the Mustang sold for $51,700, and the Challenger sold for $68,200.00. (Doc. # 37-1, Def. Ex. A). Plaintiff received less than he desired for each vehicle, and brought a claim seeking to recover the amount he thought the vehicles would have sold for at the no reserve auction. Plaintiff seeks general damages for the alleged "diminution in value" of the two vehicles in an amount of approximately $99,000.00. (Doc. # 37 at 4).

In support of his claim for damages resulting from diminution in value, Plaintiff retained Bruce Shaw, Esq., to offer his opinion as to damage caused to the cars. Plaintiff seeks to

2

introduce Mr. Shaw as an expert witness. Defendant objects, on the basis that Mr. Shaw is not qualified to testify as an expert in the diminution in value of the vehicles and that Mr. Shaw did not use a generally accepted methodology in arriving at his valuation of the vehicles.

### EXPERT WITNESS STANDARD

It is the burden of the party offering the expert to lay a proper foundation for the admission of expert testimony and the admissibility must be shown by a preponderance of the evidence. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002), citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert v. Merrell Down Pharmaceuticals, Inc., 509 U.S. 579, 592, n. 10 (1993)). In Daubert, the United States Supreme Court invalidated the "general acceptance" test that had been established in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), and required the trial courts to act as gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury.

Rule 702 of the Federal Rules of Evidence allows the admissibility of expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Federal Rules, especially Rule 702, place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Therefore, the Federal Rules of Evidence, not Frye, provide the standard for admitting expert scientific testimony in a federal trial. U.S. v. Piccinonna, 885 F.2d 1529, 1531 (11th Cir. 1989). Federal Rule of Evidence 702 is the tool that sets the Daubert analysis in motion. Rule 702 permits testimony at trial regarding the scientific evidence if the Daubert standard is met.

The focus of the Court's inquiry must be based solely on the principles and methodology of the expert, and not on the conclusions that the expert reaches. Daubert, 509 U.S. at 594. A judge's role is to keep unreliable and irrelevant information from the jury due to the potential to create confusion and it lacking probative value. Allison v. McGhan Medical Group, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

In Daubert, the Supreme Court set out a two-prong analysis for determining whether expert scientific testimony is admissible under Fed R. Evid. 702: (1) whether the evidence constitutes scientific knowledge; and (2) whether the evidence is relevant, *i.e.*, whether it would "assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 589-91, 113 S. Ct. at 2794-96. Factors relevant to the determination of whether a technique constitutes scientific knowledge include: (a) whether the expert's theory can be and has been tested; (b) whether the theory has been subjected to peer review and publication; (c) the known or potential rate of error; (d) existence and maintenance of standards controlling technique's operation; and (e) whether the technique has attained general acceptance within the relevant scientific community. Id. at 593-94, 113 S. Ct. at 2796-97.

Thus, when ruling on a motion to exclude expert testimony, this Court is required to engage in a three-part inquiry to determine whether to exclude or admit the testimony in question, specifically whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Quiet Tech. DC-8, Inc. v.

4

Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). The burden rests on the Plaintiff, as the proponent of Mr. Shaw's testimony, to establish that the testimony meets the standards of Rule 702 and Daubert. See Allison, 184 F.3d at 1306. The Plaintiff need only establish that the admissibility requirements are met by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10, 113 S. Ct. at 2796. The Court notes that the rejection of expert testimony is the exception rather than the rule. Warfield v. Stewart, 2009 WL 2421594, at *1 (M.D. Fla. July 31, 2009) (citing the Advisory Committee Notes accompanying Rule 702 of the Federal Rules of Evidence).

## ANALYSIS

*(1) Whether Mr. Shaw is qualified to testify as to diminution in value of the vehicles at issue*

Rule 702 takes a liberal view of expert witness qualifications. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citing Leathers v. Pfizer, Inc., 233 F.R.D. 687, 692 (N.D.Ga.2006)). It does not mandate that an expert be recognized as a leading authority in the field in question; instead, it simply requires that he or she be "competent and qualified by knowledge, skill, experience, training, or education to render the opinion." Leathers, 233 F.R.D. at 692 (citing Siharath v. Sandoz Pharmaceuticals Corp., 131 F. Supp. 2d 1347, 1351 (N.D. Ga.2001), *aff'd sub nom.* Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194 (11th Cir. 2002)). Practical experience may serve as a basis for the qualification of an expert witness. Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). Indeed, "[e]xperts of all kinds tie observations to conclusions through the use of "general truths derived from ... specialized experience." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148-49, 119 S. Ct. 1167, 1174-75 (citing Judge Learned Hand, Historical and Practical Considerations Regarding

Expert Testimony, 15 HARV. L.REV. 40, 54 (1901)).  Thus, if there are "[g]aps in an expert witness's qualifications or knowledge, [they] generally go to the weight of the witness's testimony not its admissibility." Leathers, 233 F.R.D. at 692.

Bruce Shaw has extensive experience in the collector car industry.  For twenty years, Mr. Shaw owned and operated a body shop that specialized in the customization and restoration of 1950's – 1980's muscle cars.  (Doc. #47-1, Pl. Ex. A).  From 1970 to the present, Mr. Shaw has owned and operated Action Auto Sales, which is a company that specializes in the brokerage and sale of American collector cars from the 1950s to the 1980s.  (Id.).  He has been a licensed car dealer in the state of Pennsylvania for the past thirty-nine years.  (Id.).  For the past forty years, Mr. Shaw has attended and/or participated in numerous car auctions.  (Doc. #47-2, Pl. Ex. B). Mr. Shaw keeps abreast of the classic car market through continued research of classic car publications; attendance at auctions; the purchase, restoration, and sale of classic automobiles; service as an auction consultant; and discussion of classic car valuation with other experts in the industry. (Doc. #47-1, Pl. Ex. A).  In his capacity as an attorney, Mr. Shaw has assisted more than 100 clients in auction fraud cases, many of which involved valuation issues.  (Id.).  Mr. Shaw has authored articles on car fraud and valuation.  (Doc. #47-3, Pl. Ex. C).  Plaintiff argues that Mr. Shaw has extensive experience in the field of collector car valuation and that based on his experience, Mr. Shaw is qualified to testify as to the diminution in value of the cars in question.

Defendant concedes that Mr. Shaw has experience in working on collector automobiles. However, Defendant argues that Mr. Shaw has no experience in appraising vehicles, and as such he is not qualified to testify as an expert.  Defendant points to several other factors which it

6

argues demonstrate Mr. Shaw's lack of expert qualifications. Defendant argues that Mr. Shaw's testimony as to the originality of the features on the two vehicles is purely speculative since it is based only on the fact that the cars had documents attesting to their originality and not on a verification of whether the vehicles contained the equipment referenced in the reports. (See Doc. #34-4, Pl. Ex. D, at 64:27-65:2; 81:4-87:23). Additionally, Mr. Shaw was unaware of any additional work that Plaintiff had performed on the cars from the time of purchase to eventual sale at auction. (Id. at 71:3-73:23). Defendant also points to Mr. Shaw's lack of authoring any articles specifically about vehicle valuation and his lack of operating his own valuation business as demonstrative of Mr. Shaw's absence of expert qualifications.

While it is true that Mr. Shaw does not hold a license for automobile appraisal, both Plaintiff and Defendant's witnesses agree that there is no certification or license available for automobile appraisal or personal property appraisal. (Doc. #47-4, Pl. Ex. D; Doc #47-5, Pl. Ex. E). Mr. Shaw does, however, have plenty of relevant experience that will allow him to testify knowledgeably on this issue. He has owned a chain of automobile stores specializing in the inspection, repair, customization, and restoration of the type of cars involved in this lawsuit. He has four decades of collector experience, and has sold or brokered the sale of nearly forty collector cars. Additionally, Mr. Shaw has served as an auction consultant, where he has had the opportunity to provide valuations such as this one to many clients on cars similar to the ones involved here. He is thus familiar with the methodology of valuation for performing auction consultations utilized in this case.

Thus, this Court finds that Mr. Shaw's testimony rests upon an experience confessedly foreign in kind to the jury's own, and he is qualified to testify as an expert.

7

*(2) Whether Mr. Shaw used a generally accepted methodology in arriving at his valuation of the vehicles at issue*

Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert evidence. See Daubert, 509 U.S. at 589 n. 7, 113 S. Ct. at 2795, n. 7. This gatekeeping requirement is an important one:

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176). Thus, Rule 702 requires that expert testimony be reliable before it may be admissible.

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176; see also Clark v. Takata Corp., 192 F.3d 750, 758 (7th Cir.1999) ("In determining whether an expert's testimony is reliable, the Daubert factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training.'"). Exactly how reliability is evaluated may vary from case to case. Frazier, 387 F.3d at 1262.

In its capacity as gatekeeper in determining admissibility of expert testimony, "the trial court is to separate expert opinion evidence based on *good* grounds from subjective speculation that masquerades as scientific knowledge." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001) (emphasis added). The proponent of expert testimony always bears the

8

burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact. Frazier, 387 F.3d at 1260.

Defendant contends that Mr. Shaw failed to apply any scientific or generally accepted methodology in arriving at valuation of the two vehicles. Defendant claims that Mr. Shaw did not use any generally-accepted appraiser guidelines, formula, or customs of the industry, and that the methods he did use – reading magazines, attending auctions, talking with friends – are insufficient to meet the requirements of Rule 702. Plaintiff contends that Mr. Shaw clearly spelled out the methodology he utilized in arriving at his opinion of the pre-loss value of the vehicles, and that the methodology used falls within the scope of Rule 702.

Mr. Shaw was retained by Plaintiff to offer an opinion as to the diminution in value of the two vehicles caused by damage and the subsequent repair to saleable condition. (Doc. #47-5, Pl. Ex. E). In determining the diminution in value of the subject vehicles, Mr. Shaw retrospectively determined the vehicles' values just prior to the damages ("pre-loss value"). (Id.); (Doc. #47-6, Pl. Ex. F). Once Mr. Shaw determined the pre-loss value, he deducted from that amount the fair market value of the vehicles after they were damaged and returned to a saleable condition through basic repair. (Doc. #47-2, Pl. Ex. B).

Mr. Shaw established an understanding of the pre-loss characteristics of the cars through a review of Plaintiff's owner information including photos depicting the restoration, documentation history, an interview with the owner, and review of the supporting documents of originality for the subject vehicles. (Doc. #47-2, Pl. Ex. B; Doc. #47-5, Pl. Ex. E). Mr. Shaw examined the originality, condition and completeness of paint, body panels, interior, drivetrain,

and trim parts, the prior accident history of the subject vehicles, any documentation of originality for the vehicles, historical facts about the vehicles, and other evidence of originality. (Doc. #47-5, Pl. Ex. E). Mr. Shaw then searched for comparable sales of vehicles of like kind and quality of Plaintiff's cars. (Id.). He based his selection of comparable vehicles on his experience in the field. (Id.); (Doc. #47-6, Pl. Ex. F). He reviewed auction sales of other similar vehicles, reviewed automotive magazines which specialize in collector cars, and reviewed monthly car sales advertisements in periodicals specializing in collector cars. (Doc. #47-5, Pl. Ex. E); (Doc. #47-6, Pl. Ex. F). After selecting the best comparables, Mr. Shaw examined the sales prices of the comparables and, taking into consideration other factors, such as the fluxuations in the collector car market and the inexactitude of the comparables to the subject vehicles, determined a pre-loss value for the subject vehicles based on the sales prices or list prices of the comparables chosen. (Doc. #47-5, Pl. Ex. E; Doc. #47-6, Pl. Ex. F).

The Court notes that this is the same methodology espoused by the Defendant's expert witness, David Osborne, as the appropriate methodology to utilize in accurately valuing automobiles. (Doc. #47-4, Pl. Ex. D). As Plaintiff argues, in his deposition, Mr. Osborne outlined the sales comparison approach to automobile valuation, which Osborne describes as the "most commonly used approach to value in appraisals." (Id. at 70:17-18). In describing how to apply the sales comparison approach, Mr. Osborne indicated that one must: "describe your subject. . . identify the attributes of value for the subject type. . . look for your comparables. . . and then you compare the attributes of value in your comparables to those of your subject to determine where your subject fits in the group of comparables." (Id. at 71:3-8).

The methodology which was used by Mr. Shaw and was mirrored by Mr. Osborne satisfies the reliability test in Daubert.  Here, Mr. Shaw's methodology was clearly enumerated, allowing Defense experts to model his approach and offer differing conclusions.  Mr. Osborne's deposition lends credence to the Plaintiff's argument that Mr. Shaw's approach is common within the field of appraisals and has gained general acceptance within the car appraisal community.  The Court notes too, that the methodology laid out and followed by Mr. Shaw is consistent with the "Sales Comparison Approach to Value" laid out by the American Society of Appraisers: "A procedure to conclude an opinion of value for a property by comparing it with similar properties that have been sold or are for sale in the relevant marketplace by making adjustments to prices based on marketplace conditions and the properties' characteristics of value."[1]  Thus, the Court finds that Mr. Shaw's opinions are admissible and should be submitted to the trier of fact for evaluation of relative weight and merit.

Accordingly, it is now

**ORDERED:**

Defendant's Motion to Exclude Plaintiff's Expert Witness (Doc. #34) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this   8th    day of September, 2011.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record

---

[1] American Society of Appraisers, *Approaches to Value*, available at http://www.appraisers.org/PPHome/PPHome.aspx (last visited Sept. 2, 2011).